UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABKCO Music, Inc., *et al.*,

      Plaintiff,                      Case No. 11-10763

v.                                   Hon.  Sean F. Cox

Johnnie Washington, *et al.*,

      Defendants.

_____/

OPINION & ORDER

      In this copyright infringement action, Plaintiffs allege that Defendants infringed upon nine copyrights in musical compositions owned or controlled by Plaintiffs by using those musical compositions in a dramatic production about the life of music artist Sam Cooke.  The matter is currently before the Court on Defendants Johnnie Washington's and Robert Douglas's Motion for Summary Judgment and for Attorney Fees, pursuant to FED. R. CIV. P. 56(c).[1]  Also before the Court is Plaintiffs' Cross-Motion for Partial Summary Judgment.  The parties have fully briefed the issues and the Court heard oral argument on September 29, 2011.  For the reasons set forth below, the Court shall **DENY** Defendants' Motion for Summary Judgement and for Attorney Fees.  The Court shall also **GRANT IN PART** and **DENY IN PART** Plaintiffs' Cross-Motion for Partial Summary Judgment.

---

[1]Along with their motion pursuant to FED. R. CIV. P. 56(c), Defendants brought their "motion for summary judgment," pursuant to FED. R. CIV. P. 26(g) because Plaintiffs filed and served an "unsigned and unverified frivolous complaint."  On April 28, 2011, the Court granted Plaintiffs leave to amend their complaint so that they could serve Defendants with a signed complaint.  That same day, Plaintiffs filed their signed amended complaint.  Therefore, Defendants' motion is denied to the extent it is brought pursuant to FED. R. CIV. P. 26(g).

BACKGROUND

On or about February 25, 2011, Plaintiffs ABKCO Music, Inc. ("AMI"), ABKCO Music & Records, Inc. ("AMRI"), and Legs Music, Inc. ("Legs Music") (together, "Plaintiffs") filed this action against Defendants Johnnie Washington ("Washington"), Robert Douglas ("Douglas"), Music Hall Center for the Performing Arts, Inc. ("Music Hall"), Detroit Media Broadcast Company, LLC ("Detroit Media")[2], and John Does 1-50.

Plaintiffs' complaint asserts the following claims: "By AMI and AMRI for Damages Relative to Copyright Infringement Relating to the AV Ad for the Production" (Count I); "By AMI and Legs Music for Damages Relating to Copyright Infringement in Exhibiting the Production" (Count II); "By AMRI for Damages for Breach of Michigan Common Law Copyright Infringement Act Relating to the Defendants' Advertisement of the Production" (Count III); "By AMI and AMRI for Permanent Injunctive Relief Relating to the AV Ad for the Production" (Count IV); and "By AMI and Legs Music for Permanent Injunctive Relief Relating to Defendants' Further Performance of the Production" (Count V).

Plaintiffs seek monetary damages and permanent, injunctive relief to redress the alleged copyright infringement and prevent any further copyright infringement of Plaintiffs' music compositions and sound recordings.

On April 19, 2011, Defendants Washington and Douglas (together, "Defendants") filed a Motion for Summary Judgment and for Attorney Fees pursuant to FED. R. CIV. P. 56(c).  On June 6, 2011, Plaintiffs filed a Cross-Motion for Partial Summary Judgment Against Defendants

---

[2]Detroit Media Broadcast Company did not file an answer to Plaintiffs' complaint, and on June 24, 2011, Plaintiffs received an Entry of Default against Detroit Media Broadcast Company.

2

Washington and Douglas for Plaintiffs' First, Third, and Fourth Claims.

I.      The Parties:

     A.      Plaintiffs:

AMI is a New York corporation that is engaged in the business of music publishing. AMI owns or controls copyrights in musical compositions, including certain musical compositions written by Sam Cooke.

AMRI is a New York corporation that is engaged in the business of owning, manufacturing, distributing and commercially exploiting phonorecords embodying the musical performances of many musical artists, including Sam Cooke.  AMRI is the parent company of AMI.

Legs Music is a New York corporation that is engaged in the business of music publishing.  Legs Music owns or controls the copyrights in musical compositions, including certain musical compositions written in whole, or in part, by Robert Dwayne "Bobby" Womak.

     B.      Moving Defendants:

Johnnie Washington is the producer of the production at issue: *The Triumph and Tragedy of a Soul Stirrer – The Life of Sam* (the "Production").  Washington produced the Production on behalf of Washington Entertainment Group, LLC.

Robert Douglas is a playwright who wrote the script for the Production.

II.     Factual Background:

In May of 2010, Washington contacted Plaintiffs' New York counsel, Michael Kramer, in order to notify Mr. Kramer that he intended to launch a production called *The Triumph and Tragedy of a Soul Stirrer: The Life of Sam* – a dramatic performance about the musical artist

Sam Cooke.  (Def's Br., Ex. D).  The purpose of Washington's correspondence with Mr. Kramer was to ensure that Washington did not infringe upon any of Plaintiffs' copyrights and to secure song rights from Plaintiffs.  (*Id.*).

In an email dated November 23, 2010, Mr. Kramer, apparently as a follow-up to letters sent by Mr. Kramer in May and September of 2010, stated to Defendant, "In connection with your proposed mounting stage production entitled, 'Triumph & Tragedy of a Soul Stirrer: The Life of Sam' (the 'Production'), ABKCO has not, and will not, grant any right for any song written in whole or in part by Sam Cooke the copyright of which is owned by ABKCO to be used in any manner in the Production."  (Def's Br., Doc. No. 12, Ex. I).

In subsequent emails dated November, 24, 2010, December 16, 2011, and December 17, 2010, Washington and Douglas assured Mr. Kramer that they would not use any of Plaintiffs' musical compositions in the Production.  (Def's Br., Exs. I, H).

Defendants launched five performances of the Production at the Music Hall Center for the Performing Arts in Detroit, Michigan, from December 20, 2010 to January 2, 2011.  During each of these performances, Defendants had a performer sing a medley of Sam Cooke songs before the main scenes of the Production.  The medley included the following musical compositions written by Sam Cooke and owned by AMI and AMRI: "You Send Me," "Another Saturday Night," "Cupid," "Wonderful World," "Having a Party," and "Bring it on Home to Me." (Complaint at 6).  The medley also included a performance of the song "I Wish He Didn't Trust Me So Much," written by Bobby Womak and Owned by Legs Music.[3]

---

[3]Hereinafter, the copyrighted musical compositions owned by Plaintiffs and used in the Performance will be referred to as the "Songs."  In addition, the copyrighted sound recordings owned by AMRI and used in the AV Ad will be referred to as the "Recordings."

4

During the performance of these songs, the theater lights were on and the stage curtains were closed. After the performer completed his medley before the each performance, the lights were dimmed, the curtains were opened, and the Production began.

To promote the Production, Defendants contracted Detroit Media Broadcast ("DMB")[4] to create a promotional video (the "AV Ad"), which was uploaded to the website YouTube.com. (Douglas Aff., Def's Resp., Ex. B at ¶ 5). Plaintiffs became aware of the AD Ad on December 17, 2010. (Plf's Mtn. Br., Ex. B at 12; Douglas Aff. at ¶ 5). The AV Ad used musical compositions which infringed upon copyrights owned by Plaintiffs, including the songs "Wonderful World," "A change is Gonna Come," and "Touch the Hem of His Garment." Furthermore, the AV Ad included the master sound recordings of Sam Cooke's performances of these songs, which are also owned by Plaintiffs. Eventually, the AV Ad was removed from YouTube.[5]

Defendants scheduled a second series of performances to begin on February 26, 2011, but, in anticipation of this action, canceled the performances two weeks prior to opening.

_____

[4]In numerous emails and declarations submitted by the parties, the moving Defendants asserted that they contracted Detroit Media Broadcast Company to produce a commercial advertisement for the Play. Months after the parties filed their motions, Washington filed additional declarations asserting that non-party Washington Entertainment Group hired non-party Voice Over Production to produce the AV Ad. The Court will not consider these declarations as they are a late attempt to create an issue of fact, and were not timely submitted to the Court. Nonetheless, the name of the party that created the AV Ad is immaterial to the issues relevant to the instant motions.

[5]Defendants contend that Mr. Kramer contacted YouTube staff and had the AV Ad removed, pursuant to Plaintiffs' rights under the Digital Millennium Act. (Doc. No. 49, 9/16/11 Washington Aff.). Plaintiffs, however, contend that Mr. Kramer never contacted YouTube to have the AV Ad removed. (Kramer Aff., Doc. No. 50).

## STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). In deciding a motion for summary judgment, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

I. <u>Plaintiffs Have Created a Genuine Issue of Material Fact That Defendants Infringed Upon Plaintiffs' Copyrights When Defendants Used The Songs In A Dramatic Performance.</u>

In Counts II and V of their complaint, Plaintiffs allege copyright infringement with regard to the Songs used during the course of the Production. Defendants challenge Plaintiffs' assertion that the Songs were actually used during the Production. Defendants maintain that they did not infringe on any of Plaintiffs' copyrights because the Songs were performed as a medley prior to the beginning of the Production and not used during the course of the Production itself.

6

Section 106 of Title 17 provides that an owner of a copyright to musical works has the exclusive rights "to perform the copyrighted work publicly," "to display the copyrighted work publically," and "in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."  17 U.S.C. §§ 106(4)-(6).

The parties agree that in order to use a musical composition in a dramatic performance, the party seeking to use the composition must obtain the "grand rights" or "dramatic rights" to the song.[6]  "Grand rights are required if: (1) a song is used to tell a story. . . or (2) a song is performed with dialogue, scenery, or costumes." *Gershwin v. Whole Thing Co.*, 1980 WL 1180 at *4 (C.D. Cal. 1980) (internal citations omitted); *see generally Robert Stigwood Group Ltd. v. Sperber*, 457 F.2d 50, 56 (2d Cir. 1972) (reversed on other grounds); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F. 2d 505, 511 (9th Cir. 1985).  While it is not necessary that an entire work is copied, "if so much is taken that the value of the original is sensibly diminished, or the labors of the original author are substantially, to an injurious extent, appropriated by another, that is sufficient to constitute an infringement." *Bradbury v. Columbia Broadcasting System, Inc.*, 287 F.2d 478, 485 (9th Cir. 1961).

In this case, it is undisputed that Plaintiffs did not grant Defendants any rights in the Songs for use in the Production.  It is also undisputed that a singer performed a medley of the Songs and that the core of the Production was a "dramatic performance."

Defendants, however, contend that the Songs were used in a non-dramatic medley prior to the opening scene of the Production.  Specifically, Defendants assert that the Songs were not used to tell a story and were not performed with dialogue, scenery, or costumes.  In support of

---

[6]Plaintiffs do not raise any arguments relating to infringement of non-dramatic rights.

7

this position, Defendants submitted the affidavit of Johnnie Washington, who stated:

> Prior to the 'dramatic performance' play run from December 30, 2010 thru[sic] January 2, 2011, we arranged a 'non-dramatic medley' tribute to Same Cooke's music to be performed at 8:00 p.m. to 8:15 p.m. prior to the play production being opened at 8:15 p.m. as the patrons walked in and were being escorted by the ushers. We arranged for the stage curtains to be closed and the singer in a tuxedo performed a medley in front of the stage curtains. The singer did not appear until two (2) scenes later after the play opened. After he completed his presentation, I came from behind the curtains and addressed the audience. . .
>
> Then afterwards, the curtains were opened, drawn back and fully opened, and remained open thereafter. Then the house lights were dimmed to dark until intermission and the theater was illuminated.

(Def's Br., Ex. D, 4/14/11 Washington Aff. at ¶ 11).

Additionally, Defendants submitted affidavits of dozens of patrons who attended the December 30, 2010 performance of the Production. (Def's Br., Ex. C). Each of these affidavits are identical and state, in part:

> There were songs performed by the singer were a medley of Sam Cooke's songs in parts, such as "You Send Me," "Another Saturday Night," and others as attendees were entering the theater to be seated as well.
>
> The theater house lights were fully illuminated and the play had not yet commenced; all curtains were closed.
>
> The singer completed his medley tribute, lasting about 10 minutes, after most of the attendees had arrived in a medley tribute fashion. Thereafter a host came out from behind the stage curtains, [and] the singer left the stage. . .
>
> * * *
>
> There also was a song that appeared to sound like Bobby Womack and it was not the actual Bobby Womack song that I know, 'I Wish he Didn't Trust Me So Much.'

8

(*Id*. at ¶¶ 3-5, 7).

Johnnie Washington also declared, "The director, playwright and I, as the producer, did not use any songs of Abkco Music, Inc., Abkco Music & Records, Inc. and Legs Music, Inc. 'in' the dramatic performance." (Def's Br., Ex. D at ¶ 9). Additionally, Defendants provided a copy of the script of the Production, which did not include any reference to the Plaintiffs' Songs. (Def's Br., Ex. B). Finally, Defendants assert that they never used Bobby Womack's song "I Wish He Didn't Trust Me So Much" in the Production, and that the actual song performed by Bobby Womack's character is called "From Time to Time," which is a song written and composed by Defendant Washington. (Def's Br., Ex. D at ¶ 7).

Defendants, relying on *April Productions, Inc. v. Strand Enterprises*, 221 F.2d 292 (2nd Cir. 1955), contend that, because the Songs were performed prior to the dramatic performance, their use of the Songs does not constitute copyright infringement.

In *April Productions*, the defendants, after acquiring the limited rights to plaintiff's songs, performed a medley of songs during the intermission of a dramatic performance. The plaintiff filed an action against the defendants, alleging that the medley infringed upon plaintiff's copyrights because the songs were performed outside of the scope of defendants' license. The Second Circuit Court of Appeals disagreed and held:

> The worst that could be said would be that [the songs] were sung in an intermission between the acts of a dramatic performance. Such a rendition is 'non-dramatic' within the meaning of the license. The word 'dramatic' as there used cannot be stretched to cover it. The license, as concluded above, permits the rendition of non-instrumental compositions, such as were performed here, with 'words, dialogue, costume accompanying dramatic action or scenic accessory' without their getting into the 'dramatic.' Those concomitants of the rendition would give it a much more dramatic tinge than its mere interjection as an entr'acte. From the use in this

9

> broad license of the bare word 'non-dramatic' we cannot glean an
> intention to forbid such an interjection. There was no departure from
> the license.

*April Productions*, 221 F.2d at 296.

Although the Second Circuit found that the defendants in *April Productions* did not infringe upon the plaintiff's copyright, *April Productions* is distinguishable from the instant case because the defendants were granted a limited license, and the defendants' conduct did not fall outside of the scope of that license.  The court found that the defendants' medley performance was specifically permitted under the language of the license.  In the instant case, Plaintiffs' did not grant any rights in the Songs performed during the medley.  While the court in *April Productions* found that there was no copyright infringement when the defendants performed a medley at intermission, the case is not indicative of any outcome here because the court's ruling was based on the specific language in a licensing agreement.

Plaintiffs assert that the medley of the Songs was part of the Production and not a separate and distinct performance.  Plaintiffs submitted the affidavit of David Washington, who attended one of the December 2010 performances at the request of Plaintiffs.  (Plf's Resp., D. Washington Aff. at ¶ 3).  In his affidavit, David Washington stated that, during the Production, an actor, Hassan Watkins, played the character of Sam Cooke.  David Washington further stated, "Once the patrons were seated, Mr. Watkins, wearing a classic suit similar to suits worn by Sam while he performed during the late 1950's and early 1960's, came out and sang a medley of [six Sam Cooke songs owned by Plaintiffs]."  (*Id*. at ¶ 4).  He added:

> As he sang the medley, Mr. Watkins made sure to closely mimic the
> gestures and facial expressions that Sam Cooke fans had long
> associated with Sam.  In addition, the suit Mr. Watkins wore while
> singing was one of the suits he wore as Sam's character later in the

10

Production.  Simply put, Mr. Watkins was clearly 'in character.'

> I do not recall anyone making an announcement at the conclusion of
> Mr. Watkins' medley of songs.  As far as I was concerned (and as far
> as any reasonable person would be concerned) what followed the
> songs was merely a continuation of the Production.  It was obvious
> to me that by including the performance of Sam's classic songs, the
> producers of the Production were attempting to lend obvious weight
> to the 'story' by letting the audience hear those songs while flashing
> back to events that preceded Sam's unfortunate death.

(*Id*. at ¶ 5).  Moreover, with regard to the use of the song "I Wish He Didn't Trust Me So Much,"

as performed by Bobby Womack, David Washington stated, "Contrary to the statements made in

the declarations prepared by the Washington Defendants, the Production did include the

performance by the Bobby Womack character of Bobby Womack's hit recording of 'I Wish He

Didn't Trust Me So Much,' which was performed in an effort to move the 'story' along."  (*Id*. at

¶ 6).

Based upon the declarations of David Washington, Plaintiffs have provided evidence that

tends to show that the ten minute medley by Watkins was part of the dramatic performance.  In

viewing this evidence in a light most favorable to the Plaintiffs, Watkins, while singing the

Songs, was dressed in costume, mimicked the expressions and gestures of Sam Cooke, and was

part of the overall Production, which told the story of the life of Sam Cooke.  Additionally,

Plaintiffs have provided evidence that Defendants used the Bobby Womack song "I Wish He

Didn't Trust Me So Much" during the Production.

Plaintiffs have created a genuine issue of material fact that Defendants' Production

infringed upon Plaintiffs' copyrights because Defendants did not obtain the grand rights to the

Songs prior to using them in the Production.  Accordingly, the Court shall DENY Defendants'

motion for summary judgment as it relates to Counts II and V of Plaintiffs' complaint.

II.     <u>Defendants Failed to Address Counts I, III, and IV In Their Motion for Summary Judgment.</u>

Counts I, II, and IV of Plaintiffs' complaint relate to the alleged use in the AV Ad of the Recordings.  Defendants do not address these claims in their motion for summary judgment. Instead, the first time Defendants address Plaintiffs' claims regarding the AV Ad is in their reply brief to Plaintiffs' response to Defendant's motion for summary judgment.  Defendants' motion for summary judgment focuses solely on Plaintiffs' claim of copyright infringement as it relates to the Production and on Plaintiffs' original, unsigned complaint, which Plaintiffs remedied when this Court permitted Plaintiffs to file a signed, amended complaint on April 28, 2011 (Doc. No. 17).

Because Defendants failed to raise these additional reasons for dismissal in their motion for summary judgment[7], the Court shall not consider them.  Thus, the Court shall DENY Defendants' motion for summary judgment as it relates to Counts I, III, and IV.

III.    <u>Plaintiffs' Cross-Motion for Partial Summary Judgment as to Counts I, III, and IV (the AV Ad Claims):</u>

  A.     <u>Plaintiffs are Entitled to Summary Judgment on Their Copyright Infringement Claim Related to the Musical Compositions Used in the AV Ad (Count I).</u>

Plaintiffs contend that they are entitled to summary judgment on Count I of their complaint, which relates to copyright infringement of the Songs that were used in the AV Ad. Although Count I of Plaintiffs' complaint refers to both the musical compositions and sound recordings used in the AV Ad, it is clear from Plaintiffs' motion brief that Plaintiffs' Count I

---

[7]In their reply brief, Defendants, for the first time, assert that Count III of Plaintiffs' complaint (Plaintiffs' common law copyright claim relating to the AV Ad) should be dismissed for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6).  Defendants, however, brought their motion under FED. R. CIV. P 56(c), and do not address Count III in their motion.

applies only to those musical compositions registered under the Copyright Act. Any copyrighted sound recordings used in the AV Ad are subsequently addressed in Count III of Plaintiffs' complaint. Plaintiffs concede that their copyrighted sound recordings used in the AV Ad are not protected by the Copyright Act. Therefore this section shall apply only to Plaintiffs' copyrights in the musical compositions used in the AV Ad and the Court will later discuss Plaintiffs' claims as they relate to the sound recordings in Part III(B), *infra*.

As stated above, Defendants contracted Detroit Media Broadcast ("DMB") to create an "e-blast advertisement posting" on the internet to promote the Production. (Douglas Aff., Def's Resp., Ex. B at ¶ 5 ). In turn, DMB created the AV Ad, which included the use of the Songs. Plaintiffs became aware of the AV Ad on December 17, 2010. (Plf's Mtn. Br., Ex. B at 12; Douglas Aff. at ¶ 5).

In order to establish a prima facie case for copyright infringement under the Copyright Act, a plaintiff must show: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991).

Defendants do not challenge the fact that Plaintiffs own a valid copyright to the Songs used in the AV Ad, or that the AV Ad infringed upon Plaintiffs' copyrights. Rather, Defendants contend that they were completely unaware of the material DMB used in the AV Ad and state that DMB had "complete authority to create an e-blast advertisement without violating Plaintiffs' copyrighted songs." (Douglass Aff., Def's Resp., Ex. B at ¶ 5). In his affidavit, Robert Douglas states:

> Washington Entertainment Group, LLC, advised Michael Kramer on
> December 17, 2010, that Detroit Media Broadcast was hired as an

13

independent contractor and not as an employee to do an e-blast advertisement posting on the Internet for the play. Washington Entertainment Group, LLC, Johnnie Washington nor the undersigned did not instruct, supervise or control Detroit Media Broadcast, and it had complete authority to create an e-blast advertisement without violating Plaintiff's copyright songs. We were unaware of the material that the independent company, Detroit Media Broadcast, used in posting the material on the YouTube site that was removed by Plaintiffs.

(*Id*.).

As to the second element, Defendants did not directly infringe on the copyrights of Plaintiffs because they did not directly produce or publish the AV Ad. Therefore, Plaintiffs have proceeded on a theory of contributory infringement or, alternatively, vicarious liability in the copyright context.

i.    Contributory Infringement:

Plaintiffs first contend that Defendants are liable for copyright infringement because Defendants knew, or should have known, that DMB used Plaintiffs' copyrighted musical compositions in the AV Ad.

"Contributory infringement occurs when one, 'with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004) (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)). A cause of action for contributory infringement accrues when a defendant knows, or should have known, of the infringement. *Id*. Morever, a defendant's liability for "contributory infringement is based upon the defendant's relationship to the direct infringement." *Id*. (citing *Matthew Bender & Co. v. West Publ'g. Co.*, 158 F.3d 693, 706 (2d Cir. 1998)).

14

As stated above, Defendants contend that they were unaware of DMB's use of the Songs. At the hearing on this motion, Defendants admitted that they did not review that AV Ad before it was upoaded to YouTube.  Nonetheless, even if Defendants did not know that DMB used the Songs in the AV Ad, Plaintiffs have sufficiently established that Defendants *should have* known about the infringing conduct of DMB.  Defendants were aware of Plaintiffs' concern of Defendants' possible infringement on Plaintiffs' copyrights as early as September 2010.  (Plf's Resp., Ex. C).  Defendants also concede that they contracted DMB to "develop an e-blast advertisement to promote the play. . ."  (7/12/11 J. Washington Aff. at ¶ 12).  While Douglas insists that DMB had "complete authority to create an e-blast advertisement without violating Plaintiffs' copyright songs," Douglas fails to assert in his affidavit who granted the authority for DMB to produce the AV Ad.  Logically, Defendants, as the party retaining DMB to promote the Production, must have been the party to grant the authority to develop the AV Ad.  Thus, Defendants have materially contributed to DMB's infringing conduct.

Moreover, Defendants cannot shield themselves from liability by simply failing to watch their own promotional video.  Defendants should have known the contents of the AV Ad. Defendants' relationship with DMB, as well as Defendants' financial interest in the successful promotion of the Production, renders Defendants liable for the copyright infringement of DMB. *See generally Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2nd Cir. 1963).  The facts surrounding the creation and publication of the AV Ad are not refuted, and thus, Plaintiffs have established that there is no genuine issue of material fact that Defendants knew, or should have known, of DMB's infringing conduct.

Accordingly, the Court shall GRANT Plaintiffs' partial motion for summary judgment as

it relates to Plaintiffs' claim under the Copyright Act (Count I) for the infringement of copyrighted musical compositions that were used in the AV Ad. As will be discussed below, with regard to Plaintiffs' copyrighted sound recordings fixed prior to February 15, 1972 and used in the AV Ad, the Court concludes that Plaintiffs have not established the liability of Defendants for copyright infringement under the common law.

ii.   Vicarious Liability:

Alternatively, Plaintiffs contend that Defendants are vicariously liable for the infringing conduct of DMB. Unlike the theory of contributory infringement, knowledge of the infringing conduct is not necessary to find a defendant vicariously liable for copyright infringement of another. Even in the absence of an employer-employee relationship, a defendant can be vicariously liable for copyright infringement when: (1) a defendant has the right to and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement." *Gordon v. Nextel Comm'n*, 345 F.3d. 922, 925 (6th Cir. 2003.); *see also Gershwin Publ'g Corp.*, 443 F.2d at 1162 (2d Cir. 1971). Knowledge of the infringement, or lack thereof, is irrelevant to a determination of vicarious copyright liability. *Id*.

Here, it is undisputed that Defendants had a financial interest in the promotion of their for-profit production. The AV Ad was intended as an audio/visual advertisement for the Production. (7/12/11 J. Washington Aff. at ¶ 9).

As for the second element, while Defendants admit that they contracted DMB to create the AV Ad, they contend that they did not "control the work product of Detroit Media Boradcast." (7/12/11 J. Washington Aff. at ¶ 12). As stated in *Gordon*, Defendants' ignorance as to the contents of the AV Ad is not a defense to vicarious liability within the copyright

16

context.  Nonetheless, it is Plaintiffs' burden to provide evidence that Defendants had the right to and ability to supervise the infringing conduct.  Plaintiffs direct this Court to a December 17, 2011 email from Douglas to Mr. Kramer, in which Douglas states:

> In regards to the .30 second promotional spot on Youtube.com, it was produced by a professional firm hired by us with no intent of copyright infringement.  We did not select the songs used in the spot. We are in the process of removing those recording sound-bites from the Youtube.com promotion.

(Plf's Mtn. Br, Ex. B at 15).

Thus, Plaintiffs have submitted indirect evidence as to Defendants' ability to control the content of the AV Ad.  From these statements, it is easy to infer that, because Defendants contracted DMB to promote the Production, Defendants had the right and ability to determine the content of its own AV Ad.

Rather than rebut Plaintiffs' claims, Defendants' brief focuses on the fact that Defendants did not "supervise or control" DMB's work product.  The standard, however, is whether a defendant has *the right to and ability to* supervise the infringing conduct.  Again, knowledge of the infringement is irrelevant for the purposes of vicarious liability in the copyright infringement context.

Plaintiffs have shown that there is no genuine issue of fact that Defendants had the right or ability to determine the content of the AV Ad produced by DMB.  As stated above, the Court shall GRANT Plaintiffs' motion for summary judgment as it relates to Count I of Plaintiffs' complaint on the alternative basis of vicarious liability.

B.  <u>Plaintiffs Have Failed to Provide Evidence in Support of Their State Law Claim for Copyright Infringement Relating to the Use of Sound Recordings Embodying Performances of Sam Cooke (Count III).</u>

17

Count III of Plaintiffs' complaint alleges common law copyright infringement for the use in the AV Ad of the Recordings, which were fixed prior to February 15, 1972.

Section 301(a) of the Copyright Act provides:

> On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  Notwithstanding § 301(a), § 301(c) provides:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. The preemptive provisions of subsection (a) shall apply to any such rights and remedies pertaining to any cause of action arising from undertakings commenced on and after February 15, 2067. Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067.

17 U.S.C. § 301(c).  Thus, under § 301(c), sound recordings (which are separate from musical composition copyrights) fixed prior to February 15, 1972, are not subject to federal copyright protection under the Copyright Act.  *See Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792, 804 (6th Cir. 2005); *Johnson v. Cypress Hill*, 641 F.3d 867, 870 (7th Cir. 2011) ("[U]nder the Copyright Act, sound recordings fixed before February 15, 1972 are not subject to copyright protection, but may be protected by state law.").

In their motion, Plaintiffs concede that Sam Cooke died in 1964, and therefore "all sound recordings involved in this matter are not covered by the Copyright Act."  (Plf's Mtn. Br. at 6).

Therefore, the sound recordings of Sam Cooke's songs used in the AV Ad are not protected by the Copyright Act.

In the context of copyright infringement claims relating to recordings fixed prior to February 15, 1972, "Michigan courts follow the general law of unfair competition." *A & M Records, Inc. v. M.V.C. Distributing Corp.*, 574 F.2d 312, 313 (6th Cir. 1978). "Michigan's common law of unfair competition prohibits unfair and unethical trade practices that are harmful to one's competitors or to the general public." *Atco Industries, Inc. v. Sentek*, 2003 WL 21582962 (Mich. App. 2003). Each unfair competition case "is determined upon its own facts and relief is based upon the principles of common business integrity." The "gist. . . in all unfair competition cases, is fraud, and the gist of the charge is that the public is so misled that plaintiff loses some trade by reason of the deception." *Revlon, Inc. v. Regal Pharmacy, Inc.*, 29 F.R.D. 169, 174 (E.D. Mich. 1961).

Here, Plaintiffs allege that "the unauthorized synchronization of the Recordings falls under the scope of Michigan's unfair competition law because it can easily lead the general public to believe that Plaintiffs either sponsored or supported such AV Ad and the Production." (Plf's Mtn. Br. at 6). Plaintiffs further claim that "[t]he deceptive use also clearly violates Plaintiffs' ownership interest in the sound recordings and dilutes the strength of ABKCO's ability to license the use of such classic songs." *Id*.

Plaintiffs, however, have not produced any evidence to support these conclusory statements. Plaintiffs have not produced evidence to establish fraud or deceit on the part of Defendants, and have not shown how Defendants intended to mislead the public by using Plaintiffs' sound recordings. Moreover, Plaintiffs state that Defendants' use of the songs

"dilutes the strength of ABKCO's ability to license the use" of the songs, but fail to explain exactly how Defendants' use of the recordings in an online AV Ad causes Plaintiffs to "lose some trade." Furthermore, Plaintiffs do not cite any case law to support their position that a defendant can be held liable under the common law theory of unfair competition for conduct similar to the conduct of Defendants in this case.

As a result of Plaintiffs lack of evidentiary support, a genuine issue of material fact remains as to whether Defendants' use of the Recordings amounted to unfair competition. The Court shall DENY Plaintiffs' partial motion for summary judgment as it relates to Count III of their complaint.

      C.     <u>Plaintiffs' Request for Injunctive Relief With As Related To The AV Ad (Count IV):</u>

In Count IV of Plaintiffs' complaint, Plaintiffs request that the Court grant a permanent injunction "barring the Defendants, their officers, agents, servants, employees and attorneys and all persons in active concert and participation with them from using any portion of the copyrighted materials of AMI and/or AMRI in connection with the promotion or advertising of the Production." (Complaint at ¶ 59). In their motion for partial summary judgment, Plaintiffs request summary judgment on their request for a permanent injunction as related only to the AV Ad.

Under the Copyright Act, "[a]ny court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

A plaintiff seeking a permanent injunction must make a "'showing of past infringement

and a substantial likelihood of future infringement'" in order to justify the issuance of a permanent injunction. *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 492 (6th Cir. 2007) (quoting Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06 [B] (2007)). "Not only is the issuance of a permanent injunction justified '[w]hen a copyright plaintiff has established a threat of continuing infringement, he is *entitled* to an injunction.'" *Id.* (quoting *Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir.1990) (emphasis in original)). To deny a permanent injunction where a plaintiff has established liability would be an abuse of discretion because "in copyright infringement actions, the denial of a request for injunctive relief could otherwise 'amount to a forced license to use the creative work of another." *Id.* (quoting *Taylor Corp. v. Four Seasons Greetings, LLC*, 403 F.3d 958, 967-68 (8th Cir. 2005)).

Defendant asserts that Plaintiffs' request should be denied because the Av Ad has been removed and the issue is moot. Additionally, Defendants contend that injunctive relief is not warranted because Plaintiffs have an available remedy at law via the Digital Millennium Act, which permits owners of copyrighted works to remove infringing material from websites through written requests to internet service providers.

Defendants' reliance on the Digital Millennium Act as an adequate remedy at law, however, is misplaced. While it is true that the Digital Millennium Act gives Plaintiffs the authority to remove any infringing materials on the internet, this remedy at law does not prevent Defendants, or any other infringing party, from initially posting the infringing materials. As Plaintiffs state in their reply brief, once a video is posted on the internet, it is easily copied, linked, and distributed. (Plf's Reply at 5). The ability to remove the infringing material does not prevent the harm that may be caused by the initial accessibility, no matter how brief, of the

21

infringing material.

Plaintiffs have established liability for past infringement with regard to Defendants AV Ad.  Moreover, given the nature of the infringement, specifically a third parties' ability to easily reproduce or redistribute a video that is posted on a website, there is a substantial likelihood of future infringement if Defendants are permitted to maintain its AV Ad online.  As explained by the Eighth Circuit Court of Appeals in *Taylor Corp*, declining Plaintiffs' request for a permanent injunction would essentially amount to a forced license of Plaintiffs' copyrights.  Thus, the Court shall GRANT Plaintiffs' request for a permanent injunction as related to the AV Ad.

CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment and for attorney fees (Doc. No. 12) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for partial summary judgment (Doc. No. 25) is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiffs' motion is **GRANTED** as to Count I and Count IV of Plaintiffs' Complaint.  Plaintiffs' motion is **DENIED** as to Count III of Plaintiffs' Complaint.

**IT IS FURTHER ORDERED** that Defendants, their officers, agents, servants, employees, and all persons in active concert and participation with them are barred from using any portion of the copyrighted musical compositions of AMI and/or AMRI in connection with the promotion or advertising of the Production.

Presently, the permanent injunction shall apply only to Plaintiffs' musical compositions that qualify for protection under the Copyright Act.  The permanent injunction does not apply to any of Plaintiffs' sound recordings fixed prior to February 15, 1972, as Plaintiffs have not

22

established liability for the infringement of those copyrights under common law.

Accordingly, only Counts II, III, and V of Plaintiffs' Complaint remain in dispute.

**IT IS SO ORDERED.**

S/Sean F. Cox
Sean F. Cox
United States District Court

Dated:  October 18, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 18, 2011, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager